UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

*IN RE* EX PARTE APPLICATION OF SBK ART LLC

24 Misc. 147 (PAE) (RFT)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This case involves an application under 28 U.S.C. § 1782 for discovery in aid of foreign

proceedings.  Petitioner SBK ART LLC ("SBK") seeks documents and deposition testimony

from a law firm, respondent Akin Gump Strauss Hauer & Feld, LLP, and its affiliate, Akin

Gump, LLP (collectively, "Akin").  SBK seeks these for use in pending civil proceedings in

Malta and the General Court of the European Union and contemplated civil proceedings in the

Netherlands.  It contends that these materials would support its claim in foreign litigation that

Akin waged an advocacy campaign, on behalf of SBK's corporate adversaries, to have SBK

sanctioned by the EU Council as part of a scheme to dilute SBK's ownership position in a

Croatian company, Fortenova Grupa d.d. ("Fortenova").

On April 3, 2024, the Court referred SBK's application to United States Magistrate Judge

Robyn Tarnofsky.  Dkt. 14.  After extensive briefing and argument, Judge Tarnofsky issued a

Report and Recommendation.  Dkt. 46 (the "Report").  It recommends that the Court (1) grant a

portion of SBK's discovery application, in particular, its request for materials relating to Akin's

relevant lobbying efforts; but (2) deny discovery as to the substantial majority of the application,

including to the extent the application sought materials relating to Akin's provision of legal

services.

Akin has filed objections to the Report, Dkt. 51 ("Akin Obj."), to which SBK has responded, Dkt. 55 ("SBK Response"). SBK does not challenge the aspects of the Report that are adverse to it, that is, the limits on discovery that the Report proposes.

For the reasons that follow, the Court adopts Judge Tarnofsky's thorough and well-reasoned Report in its entirety. It accordingly authorizes SBK to obtain discovery from Akin, but only within tightly defined parameters.

## I.    Background[1]

The following summary focuses on the facts necessary for an assessment of the limited issues presented.

### A.    The Parties

The foreign proceedings in aid of which SBK seeks discovery here center on a battle for corporate control of Fortenova, a food and retail company based in Zagreb, Croatia, which operates in several countries in southeastern Europe. Report at 2. SBK, a Russian entity, claims it is the rightful owner of an approximately 42% interest in Fortenova through its ownership of depositary receipts. *Id.*

---

[1] The facts summarized in this section are primarily drawn from the Report, Dkt. 46, Akin's objections, Dkt. 51, and the attached declaration of Robert H. Pees, Dkt. 52, and SBK's response, Dkt. 55. The Court has also considered the parties' pleadings and voluminous submissions to Judge Tarnofsky, including the Petition, Dkt. 8 ("Pet."), and the attached declarations of Michael A. Piazza, Dkt. 3 ("Piazza Decl."), and Gabriel Lansky, Dkt. 4 ("Lansky First Decl."); SBK's brief in support, Dkt. 6, Akin's brief in response, Dkt. 22, and the attached declarations of Liz Osborne, Dkt. 23 ("Osborne Decl."), Ross Denton, Dkt. 24 ("Denton Decl."), Daniel Buttigieg, Dkt. 25 ("Buttigieg Decl."), Christiaan Zijderveld, Dkt. 26 ("Zijderveld Decl."), and Robert H. Pees, Dkt. 27; and SBK's reply brief, Dkt. 33, and the attached declarations of Robert S. Landy, Dkt. 33-1, Gabriel Lansky, Dkt. 33-2 ("Second Lansky Decl."), Ali Al-Karim, 33-3 ("Al-Karim Decl."), Elbert Jan Hendrick Zandbergen, Dkt. 33-4 ("Zandbergen Decl."), and John Refalo, Dkt. 34-5 ("Refalo Decl."); Akin's Responses to Judge Tarnofsky's Orders of July 1 and July 8, 2024, Dkts. 37, 38, and the attached declarations of Ross Denton, Dkt. 39 ("Second Denton Decl."), Richard Hornshaw, Dkt. 40, and Robert H. Pees, Dkt. 44; and SBK's Response to Judge Tarnofsky's Orders of July 1 and July 8, 2024, Dkt. 43.

Akin is a multinational law firm. Its London office has advised Fortenova on "issues arising from the presence of sanctioned holders in its capital structure." *Id.* at 3 (quoting Osborne Decl. ¶ 6). Akin is also a registered lobbyist for Fortenova, including in the United States. *Id.*

**B.    SBK Is Sanctioned by the EU and Frozen Out of Fortenova**

In April 2022, the Russian bank PJSC Sberbank of Russia ("Sberbank") placed its Fortenova holdings into its wholly owned special purpose vehicle, SBK. *See id.* at 2; Osborne Decl. ¶ 7. At the time, the second-largest minority owner of Fortenova was Open Pass Limited ("Open Pass"), a Maltese company owned by Pavao Vujnovac. *See* Report at 2; Dkt. 13-1, at 2.

After Russia's invasion of Ukraine in 2022, the United States, the United Kingdom, and the European Union ("EU") placed Sberbank on their respective sanctions lists. Report at 2. Thereafter, Sberbank sold its stake in SBK to Saif J.S.M. Alketbi ("Alketbi"), a United Arab Emirates-based businessman. *Id.* On December 16, 2022, the EU Council added SBK to its list of sanctioned entities, on the grounds that (1) Sberbank still retained "effective control" over SBK and (2) that Sberbank had rendered financial assistance to the Russian Federation. *See id.* at 4; *see* Denton Decl. ¶ 7. Alketbi was not individually sanctioned. *See* Report at 4–5.

SBK alleges that, at Vujnovac's behest, Fortenova moved to block SBK from exercising its voting rights in Fortenova, on account of its sanctioned status. *See id.* at 3–4. SBK alleges that, stripped of its voting rights, it was powerless to block major changes to Fortenova's corporate structure, and that these resulted, in January 2023, in the Vujnovac-controlled Open Pass gaining control of Fortenova (the "Corporate Changes"). *Id.* at 4–5. In December 2023, Open Pass arranged for the sale of a Fortenova entity at an artificially depressed price. *Id.*; Dkt. 13-1, at 12. That, SBK claims, benefitted Open Pass and Fortenova insiders at the expense

of minority shareholders, including SBK. *See* Report at 5. As a result of these transactions, SBK alleges, its stake in Fortenova has been dramatically devalued. *See id.*

### C.      Akin's Role in the Alleged Scheme

SBK claims that Akin assisted Vujnovac in his alleged scheme to seize corporate control of Fortenova by exploiting the EU sanctions regime. *See id.* at 3–5. It claims that Vujnovac-affiliated entities and Fortenova's management, allegedly beholden to Vujnovac, directed Akin to lobby the EU Council to sanction SBK. *Id.* As alleged, the lobbying attempted to advance the narrative that SBK remained under Sberbank's control, because its nominal sale to Alketbi had not been a legitimate arm's-length transaction. *Id.*

SBK alleges that these lobbying efforts succeeded. It alleges that, in sanctioning SBK, the EU Council centrally relied on an opinion issued by Akin (the "Akin Opinion"), to the effect that, even after Sberbank had sold its stake in SBK to Alketbi, SBK could not be considered independent of Sberbank. *Id.* at 4. The Akin Opinion had concluded that documents produced by Alketbi in connection with the acquisition were "insufficient to confirm that the transaction . . . [has] resulted in SBK no longer being subject to the asset freeze restrictions imposed on its purported (former) parent company Sberbank[.]" SBK Response at 6–8. Alketbi had previously provided the documents relied upon by the Akin Opinion to Fortenova. That these ended up in Akin's hands, SBK claims, supports that Fortenova had enlisted Akin "in a plan to deny Mr. Alketbi his voting and ownership rights" by lobbying the EU Council to sanction SBK. *Id.* at 7. SBK argues that, considering "the short period of time" between the issuance of the Akin Opinion (December 14, 2022) and the EU's introduction of sanctions against SBK (December 16, 2022), the Akin Opinion "could have ended up with the Council . . . only through the Fortenova management." Report at 4.

### D.    Pending and Anticipated Foreign Litigation

SBK seeks discovery here in aid of pending civil suits in Malta and the EU, and anticipated proceedings in the Netherlands.

First, in the Civil Court of Malta, SBK has sued Open Pass and Fortenova for damages caused by the approval of the Corporate Changes (the "Malta Action"). *See* Report at 12. In that action, SBK challenges the transactions by which it was ousted from its ownership position in Fortenova. Its central claim is that Open Pass "devised and perpetrated a scheme to move all valuable assets of the Fortenova Group to a new entity owned and controlled by Mr. Vujnovac at a fraction of its true, fair value." Dkt. 6 at 7.

Second, in the General Court of the European Union, SBK seeks annulment of the sanctions imposed by the EU Council (the "EU Action"). *See* Report at 12. SBK there alleges that it was wrongfully sanctioned based on its earlier association with Sberbank, notwithstanding the fact that Sberbank had sold its stake in SBK to Alketbi.

Third, SBK anticipates filing an action in the Netherlands or another court outside the United States to seek damages caused by the Corporate Changes and other aspects of Fortenova's corporate governance. *See id.* at 7.

### E.    The Instant Petition

On March 26, 2024, SBK filed a petition under 28 U.S.C. § 1782, demanding that Akin produce documents, and submit to deposition testimony, relating to Akin's work in connection with the Akin Opinion, and its efforts to advocate on behalf of Fortenova (and regarding SBK) before the EU Council. *See* Pet.; Dkt. 3, Ex. H.

As to documents, the Petition sought documents—covering the period January 1, 2019 to the present—on the following topics: (1) Alketbi's acquisition of SBK, the Corporate Changes, and Open Pass's control of Fortenova Group, including communications on those topics between

Akin and other entities; (2) Akin's lobbying efforts on behalf of Fortenova Group in the United

States, the United Kingdom, or the European Union; and (3) communications between Akin and

the U.S. Department of Treasury's Office of Foreign Assets Control, the U.S. State Department,

the Dutch Ministry of Finance, the U.K. Office of Financial Sanctions Implementation, the

National Bank of Serbia, Croatian government officials and staff, and EU officials and staff.

Dkt. 3, Ex. H.

As to deposition testimony, the Petition sought such from Akin about (1) its role in

analyzing Alketbi's acquisition of SBK; (2) its role, responsibilities, and lobbying efforts on

behalf of the Fortenova Group in the United States, the United Kingdom, the European Union, or

before any other relevant authority, including the U.S. Department of Treasury's Office of

Foreign Assets Control, the U.S. State Department, the Dutch Ministry of Finance, the U.K.

Office of Financial Sanctions Implementation, the National Bank of Serbia, Croatian government

officials and staff, and EU officials and staff; (3) the support for its conclusion in the Akin

Opinion that Sberbank effectively controls SBK; (4) other information related to the Akin

Opinion; (5) information provided to Akin concerning Alketbi's acquisition of SBK, the

Corporate Changes, and Vujnovac's ownership and/or control over the Fortenova Group; (6)

communications between Akin and a list of enumerated individuals and entities concerning

Alketbi's acquisition of SBK, the Corporate Changes, and Vujnovac's ownership and/or control

over the Fortenova Group; and (7) Akin's document production. *Id.*

### F.    Procedural History

On March 26, 2024, SBK filed, along with the Petition, a memorandum of law in support,

Dkt. 6.[2] On April 3, 2024, the Court referred the Petition to Judge Tarnofsky. Dkt. 14. On May

---

[2] The previous day, SBK submitted a petition under § 1782 seeking discovery from Kroll LLC ("Kroll"), which the Court referred to Judge Tarnofsky. *In re SBK ART LLC*, No. 24 Misc. 142

6, Akin filed an opposition to the Petition.  Dkts. 22–27.  On May 31, 2024, SBK filed a reply.

Dkt. 33.  On July 23, 2024, Judge Tarnofsky held argument.  Dkt. 45.

On July 30, 2024, Judge Tarnofsky issued the Report, which recommended that the

Petition be granted, but with narrowed discovery parameters, as developed below.  On August

27, 2024, Akin filed objections to the Report.  Dkt. 51 ("Objections").  On September 20, 2024,

SBK responded to the objections.  Dkt. 55 ("Response").

## II.    The Report

The Report's recommendation to authorize, but sharply limit, the discovery sought by

SBK is based on its application of familiar principles under § 1782.

### A.    Legal Framework

Section 1782 authorizes district courts to order discovery from third parties in the United

States for use in foreign proceedings.  In relevant part, it provides as follows:

> The district court of the district in which a person resides or is found may order him
> to give his testimony or statement or to produce a document or other thing for use
> in a proceeding in a foreign or international tribunal, including criminal
> investigations conducted before formal accusation.  The order may be made
> pursuant to a letter rogatory issued, or request made, by a foreign or international
> tribunal or upon the application of any interested person . . . .  To the extent that the
> order does not prescribe otherwise, the testimony or statement shall be taken, and
> the document or other thing produced, in accordance with the Federal Rules of Civil
> Procedure.

28 U.S.C. § 1782(a).  The statute thus imposes three prerequisites to the issuance of a foreign

discovery order.  *See, e.g.*, *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 192 (S.D.N.Y. 2006).

First, the target must "reside" or be "found" in this District.  Second, the evidence sought must

be "for use" in a proceeding in a foreign or international tribunal.  *See ZF Auto. US, Inc. v.*

---

(PAE) (RFT) (the "Kroll Petition").  After the parties notified Judge Tarnofsky that Kroll did not
oppose the Kroll Petition, she issued a Report and Recommendation, which recommended that it
be granted.  *Id.*, Dkt. 12.  Kroll thereafter sought, and the Court granted, an extension of its time
to file objections to Judge Tarnofsky's Report until a decision issued in this action.  *Id.*, Dkt. 30.

*Luxshare, Ltd.*, 596 U.S. 619, 633 (2022). Third, the application must be made by a foreign tribunal or "any interested person." *Schmitz v. Bernstein, Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d Cir. 2004) (citation omitted).

Once those prerequisites have been satisfied, a district court has "broad discretion over the issuance of discovery orders pursuant to § 1782." *In re Edelman*, 295 F.3d 171, 181 (2d Cir. 2002). In *Intel Corp. v. Advanced Micro Devices, Inc.*, the Supreme Court set out four factors to guide district courts in exercising this discretion:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which event "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad";

> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court assistance";

> (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and

> (4) whether the request is "unduly intrusive or burdensome."

542 U.S. 241, 264–65 (2004). These "factors are not to be applied mechanically," and a district court "should also take into account any other pertinent issues arising from the facts of the particular dispute." *Kiobel v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018). A district court's discretion should be exercised sensitive to the statute's "twin aims" of "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Id.* at 244 (quoting *In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997)).

### B.    The Report's Findings

*Statutory and* Intel *Factors.*   The Report found that the Petition satisfied § 1782(a)'s

statutory requirements, and that, on balance, the *Intel* discretionary factors favored granting

discovery to SBK.  The Petition met the statutory requirements, the Report found, because (1)

Akin is found in this District, (2) the discovery sought would be "for use" in the Malta and EU

litigation, and (3) SBK is an "interested party."  Report at 11–21.

The Report found that all discretionary factors but one favored granting the Petition.  The

first factor disfavored relief, the Report found, because "many of the documents sought by the

proposed subpoenas could be demanded by" SBK from Fortenova in foreign proceedings.

Report at 29 (citing *Kiobel* 895 F.3d at 245); *cf. Klein v. Altara RK Invs. Ltd.*, No. 24-228-cv,

2025 WL 560105, at \*2 (2d Cir. Feb. 20, 2025) ("[W]hen discovery requests are submitted to

non-parties pursuant to § 1782, the district court should consider whom the documents are

actually being sought for use against.").  But, it concluded, the remaining three factors, which

favored granting relief, outweighed the first.  The second and third favored SBK, the Report

found, because Akin had not provided "authoritative proof" that the courts in the Malta Action

and the EU Action would reject evidence obtained through this proceeding nor did Akin support

its claim that SBK "[wa]s acting in bad faith to try to misuse Section 1782" to circumvent UK

and EU sanctions regimes.  *Id.* at 34–35.  And, although the Petition as-filed was overbroad in

the discovery it sought, the Report found, that defect was curable.  The fourth *Intel* factor

therefore did not require outright denial of the Petition.  *See, e.g., Mees v. Buiter*, 793 F.3d 291,

302 (2d Cir. 2015) ("[I]t is far preferable for a district court to reconcile whatever misgivings it

may have about the impact of its participation in the foreign litigation by issuing a closely

tailored discovery order rather than by simply denying relief outright." (citation omitted)).

Rather, the Report concluded, provided that the discovery parameters were adjusted to closely

track the valid litigation needs identified by the Petition, the burden on Akin would be proportionate to SBK's need for discovery. *See* Report at 35–42. On that premise, the Report concluded, the fourth *Intel* factor also favored SBK. *Id.* at 45.

*Discovery Limitations.* As to the fourth factor, the Report recommended narrowing discovery as follows, to ease the burden on Akin. First, document discovery is to be limited to non-privileged materials uniquely possessed by Akin, or that were shared with third parties other than Fortenova, between February 1, 2022 and December 31, 2023 (the "Relevant Period"), and that related to: (1) Alketbi's acquisition of SBK, (2) the Akin Opinion, or (3) the Corporate Changes. *See id.* at 43. Second, as to deposition discovery, it recommended authorizing a single deposition on (1) the above topics, limited to the Relevant Period, and (2) Akin's document production. *Id.*

*Kiobel.* The Report found that the Second Circuit's decision in *Kiobel* supported authorizing *limited* discovery. *Kiobel*, the Report observes, cautions against granting discovery where a petition seeks records from a law firm retained by the petitioner's foreign-litigation adversary, but it does not require a "reflexive[]" denial of such bids. Report at 45; *cf. Kiobel*, 895 F.3d at 248 (denying § 1782 petition where "*Intel* factors, the respect owed to confidentiality orders, and the concerns for lawyer-client relations" all weighed against granting discovery). And here, the Report found, the distinct circumstances distinguished this Petition from *Kiobel*. Principally, Fortenova's "affirmative use of the Akin Opinion by sharing it with the Dutch court and possibly the EU Council move[d] Akin's work on the Akin Opinion out of the category of legal advice provided by legal counsel." Report at 46. And the limited discovery that the Report proposed be authorized would focus on "the discoverable work of a lawyer acting as a lobbyist or business advisor," rather than as legal counselor. *Id.* at 46–47.

The Report thus recommended granting—albeit with major limitations—the Petition's § 1782 application for discovery.

## III.    Discussion

Akin makes three main objections to the Report. Each, it argues, requires the outright denial of the Petition. First, Akin argues that the Petition does not meet § 1782's second statutory requirement—that the requested discovery be "for use" in a foreign proceeding. Akin Obj. at 22. Second, it argues that the Report, in analyzing the third *Intel* factor, did not consider relevant "foreign proof-gathering restrictions." *Id.* at 19. Third, it argues that *Kiobel* requires denial of the Petition, even with the narrowed discovery parameters recommended by the Report. *See id.* at 9, 16, 22.

For the following reasons, Akin's objections, singly or jointly, do not support denying the Petition altogether. Rather, the Report's recommendation to authorize limited discovery is (1) firmly anchored in § 1782's statutory and discretionary factors and (2) consonant with *Kiobel*.

### A.    Statutory "For Use" Requirement

Akin first objects to the Report's finding that the Petition meets § 1782's requirement that the evidence sought be "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). Akin argues that the documents sought by SBK are not "for use" in the Malta and EU actions because (1) they are not "relevant" to the subject matter of those proceedings; (2) if SBK's sale to Alketbi had been legitimate, as SBK claims, SBK would have corroborating evidence of that and would not need documents from Akin to challenge the EU Council's contrary finding; and (3) the foreign proceedings are "frivolous." These arguments are easily put aside.

11

First, SBK has satisfactorily explained why the discovery that the Report approves is relevant to the ongoing foreign litigation: to support its theory there that Vujnovac and Open Pass, with Akin's assistance, improperly seized corporate control of Fortenova by exploiting the EU sanctions regime. With respect to the Malta Action, the discovery at issue may provide evidence of a scheme to block SBK from exercising the voting rights associated with its ownership interests in Fortenova. Refalo Decl. ¶ 5. And with respect to the EU Action, the materials may support SBK's claim that Akin lobbied the EU Council, at Vujnovac's behest or as a result of his influence on Fortenova, to sanction SBK to facilitate the Corporate Changes. Second Lansky Decl. ¶ 20. As SBK explains, "the EU Council's apparent reliance on the Akin Opinion in making its initial determination, Akin's conclusions and how it reached them are clearly germane to any challenge to the basis for the EU Council's ruling." SBK Response at 5. These showings satisfy Section 1782's "for use" requirement. As the Second Circuit has explained, evidence is "for use" in a foreign proceeding if it can "be employed with some advantage or serve some use in [that] proceeding." *Mees*, 793 F.3d at 298; *see also, e.g.*, *In re Asia Maritime Pacific Ltd.*, 253 F. Supp. 3d 701, 706 (S.D.N.Y. 2015) ("[D]iscovery is 'for use' in a foreign proceeding if it is relevant to the subject matter of the proceeding, and the evidence would increase the applicant's chances of success in the proceeding." (citation omitted)); *In re DNG FZE*, No. 23 Misc. 435 (PAE), 2024 WL 124694, at *3 (S.D.N.Y. Jan. 11, 2024) ("§ 1782 applicant must establish a practical use in the foreign proceeding for the discovery it seeks.").

Second, Akin mischaracterizes SBK's Petition in arguing that, to challenge the EU Council's sanctions determination, SBK does not "need" documents in Akin's possession. Obj. at 18. In the foreign proceedings, SBK seeks to show not only that the EU Council erred in finding Sberbank's sale of SBK to Alketbi illegitimate. It also seeks to show that this error

12

derived, in part, from improper pressure exerted by Akin, at the behest of Vujnovac, to advance his scheme to seize control of Fortenova. Second Lansky Decl. ¶ 20; *see also* SBK Response at 6–8; Report at 3–6. Akin may hold communications tending to support these propositions that SBK and Fortenova do not possess. Akin may possess documents revealing what prompted it to draft the Akin Opinion. And Akin may possess documents that, although not shared with Fortenova or the EU Council, shaped its conclusions in the Akin Opinion and/or evince its methodology. As the Report rightly notes, it is "not impossible" to envision "non-privileged documents never seen by Fortenova Group that could provide evidence of a scheme that culminated in the Corporate Changes," Report at 20, and such documents could be "employed with some advantage" in the foreign proceeding, *Mees*, 739 F.3d at 298.

Third, Akin terms SBK's foreign litigation "frivolous." Akin Obj. at 1. It argues that the fact that SBK has initiated eight different proceedings abroad exposes the Petition as a "ruse for obtaining discovery" for use in foreign proceedings other than those mentioned in the Petition. *Id.* at 24–25. The record evidence, however, does not support that the foreign proceedings on which the Petition relies—the Malta Action, the EU Action, and the contemplated Netherlands Action—are "abusive," *id.* at 24. That additional foreign proceedings exist does not undermine that the evidence sought here is "for use"—and has a viable use—in the actions on which the Petition relies. And the record does not support that the Petition was brought in bad faith or is "meant to harass" Akin or Fortenova. *Gorsoan Ltd. v. Bullock*, 652 F. App'x 7, 9 (2d Cir. 2016); *see also In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017) (placing onus on "'parties concerned . . . that a Section 1782 applicant is attempting to use foreign litigation as a ruse for obtaining discovery' for use in other foreign proceedings" to "bring evidence of such chicanery to the . . . court's attention."); *see also Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d

1095, 1101 n.6 (2d Cir. 1995) ("[I]f the district court determines that a party's discovery application under section 1782 is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application in toto, just as it can if discovery was sought in bad faith in domestic litigation.").

The Court thus rejects Akin's objection based on the statutory "for use" requirement.

## B.     Third *Intel* Factor: Attempt to Circumvent Foreign Laws or Policies

Akin next objects to the Report's finding that the third *Intel* factor weighs in SBK's favor. This factor asks "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." 542 U.S. at 264–65. Akin argues that the Report did not consider its arguments that (1) Maltese and Dutch attorney-client privilege law would prohibit the discovery sought by the Petition, and (2) UK and EU sanctions regimes would prohibit Akin from propounding discovery on SBK were this discovery requested in Malta or the EU. Dkt. 51. Akin mischaracterizes the Report, which rightly rejected these arguments.

First, contrary to Akin's slur that Judge Tarnofsky "improperly avoided an analysis of foreign proof-gathering restrictions," Akin. Obj. at 20, the Report did so. It thoroughly considered Akin's arguments (reprised here) as to foreign privilege and sanctions law. Thus, the Report considered, *inter alia*, the arguments that SBK "ha[d] already sought and been denied the requested discovery in foreign fora"; that SBK "would be unable to obtain any of the materials it requests in the foreign proceedings due to proof-gathering restrictions"; that SBK "is seeking discovery it is prohibited from receiving in the foreign fora"; and that EU law "could prohibit discovery of documents provided to the EU Council." Report at 31–36. The Report found these unsubstantiated, as reviewed below. *See id.* at 35; *see, e.g., Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 153 (2d Cir. 2022) ("[C]ircumvention occurs where the

14

applicant uses a § 1782 application to avoid measures that are intended to restrict certain means of gathering or using evidence."). That Akin's arguments failed does not support its false charge that they were ignored.

Second, Akin is mistaken that § 1782 requires the materials sought by the Petition to be discoverable under Malta and EU law. The Second Circuit has emphasized that "§ 1782 contains no foreign-discoverability requirement." *Mees*, 793 F.3d at 303. It does not require "that evidence sought in the United States . . . be discoverable under the laws of the foreign country that is the locus of the underlying proceeding." *In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997). Rather, § 1782's reference to "proof-gathering restrictions [is] best understood" as encompassing "rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information." *Id.* at 303 n.20 (quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80–81 (2d Cir. 2012)) (emphasis in original); *see also Euromepa*, 51 F.3d at 1101 ("[W]e do not think that the district court's concern for trespassing on the prerogatives of French sovereignty should have weighed so heavily in its decision. France can quite easily protect itself from the effects of any discovery order by the district court that inadvertently offended French practice.").

To the extent Akin faults the Report for not finding that the materials sought would necessarily be admissible in the Malta and EU actions, Akin misapprehends the governing standard. Just "as a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application." *Brandi-Dohrn*, 673 F.3d at 82 (emphasis in original);

*Sampedro v. Silver Point Cap., L.P.*, 818 F. App'x 14, 17 (2d Cir. 2020) ("[O]ur precedents

make clear[] [that] discovery need not be admissible to be for use in a litigation, as there is no

statutory basis for such a requirement." (citation omitted)); *In re Accent Delight Int'l Ltd.*, 791 F.

App'x 247, 251 (2d Cir. 2019) (same); *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG,*

*L.L.P.*, 798 F.3d 113, 122 (2d Cir. 2015) (similar).  Moreover, as the Report recognized, to the

extent Akin seeks to make discrete claims as to foreign privilege law, it may pursue these by

including these in a privilege log identifying assertedly privileged subsets of the discovery.  That

some discovery sought may prove privileged does not support an outright denial of relief.  *See*

*Mees*, 793 F.3d at 302; *In re Lane*, No. 22 Misc. 34, 2022 WL 16737132, at *3–5 (S.D.N.Y.

Nov. 7, 2022).[3]

Third, Akin has not substantiated its claim that the Petition attempts an end run around

applicable sanctions law in the United Kingdom and the EU.[4]  In support, Akin submitted a

declaration by Ross Denton, senior counsel in the London office of Van Bael Bellis LLP.  He

opines about "the effect" of UK and EU sanctions laws on "potential compliance with a

subpoena issued by . . . a sanctioned entity."  Second Denton Decl. ¶ 2.  Based on parallel

language in EU and UK laws, Denton opined that:

> The application of EU (and UK) sanctions does not prevent a designated person
> from being able to benefit from any legal rights afforded to it, but simply that it
> would be unlawful under EU (and UK) law for any EU (or UK) person to provide
> that designated person with funds or economic resources.  A designated person can
> clearly bring an action in a court, but any measure or remedy, particularly one

---

[3] Section 1782(a) protects privileged material from disclosure.  It states: "A person may not be
compelled to give his testimony or statement or to produce a document or other thing in violation
of any legally applicable privilege."  28 U.S.C. § 1782(a).

[4] Sberbank has been sanctioned in the United Kingdom since April 2022.  Denton Decl. ¶ 23.
Akin's argument assumes that SBK is subject to the same designation as Sberbank, based on the
EU Council's finding that it remains under Sberbank's effective control.  *Id.*  SBK disputes this
assumption, but its argument does not depend on it.  *See* Al-Karim Decl. ¶ 32.

> involving transfer of funds or economic resources to that person, needs to be
> considered in the context of the sanctions.

*id.* ¶ 5; *see also* Denton Decl. ¶ 21.  Denton, however, did not identify *any* authority holding that

the prohibition on "transfer[ring] funds or economic resources" extends to providing discovery

pursuant to a court order (much less a U.S. court order directed to Akin's U.S. office).  Instead,

his opinion surmises that "attorneys in Akin's UK office *could* face sanctions for providing

'economic resources' to SBK, because the clear intention of the [Petition] is to take material

provided by Akin to assist in litigation that preserves or enhances SBK's commercial interests."

Denton Decl. ¶ 25 (emphasis added); *see id.* at ¶ 34 (reasoning similarly as to EU sanctions).

Denton's key assumption—that propounding discovery amounts to a "transfer of economic

resources"—is, however, unsupported.  And it is in tension with his representation that a

sanctioned entity can "clearly bring an action in a court."  Second Denton Decl. ¶ 5.

   Denton's assumption is further undermined by legal authority identified in a declaration

submitted by SBK's foreign-law expert, Ali Al-Karim, a barrister at Brick Court Chambers and a

specialist in sanctions law.  Al-Karim Decl. ¶¶ 1, 6–7.  Al-Karim explains that, in *Mints v. PJSC

Bank*, [2023] EWCA Civ 1132, the English Court of Appeal held that the prohibition on

providing "funds and economic resources" to sanctioned entities does not apply to "normal

judicial functions."  Al-Karim Decl. ¶¶ 32–41; *see id.* ¶¶ 76–81 (EU law).  Denton's declarations

notably fail to engage with—they do not even mention—*Mints*.  Akin's charge that SBK has

engaged in bad-faith evasion of UK and EU law instead rests on supposition and *ipse dixit*.

   In light of the above, the Report was clearly correct to find the weight of authority before

the Court to favor approving discovery pursuant to § 1782:

> Respondents' experts speak in tentative terms about the possibility of sanctions
> violations because of laws against providing sanctioned entities with "funds and
> economic resources," while Petitioner's expert definitively takes the position,

which makes more sense, that sanctioned entities are entitled to seek and receive discovery to defend themselves.

Report at 36 (citing Denton Decl., Buttigieg Decl., Zijderveld Decl., and Al-Karim Decl.).[5]  In other words, Akin has failed to substantiate its claim that EU and UK sanctions laws prohibit a sanctioned entity from "gathering or using evidence" to challenge the underlying sanctions determination. *See id.* ("Even Respondents do not appear to be saying that there is no way for them to produce the requested materials without a risk of sanctions—they seem to say that sanctions can be avoided if U.S. lawyers do the review and production . . . ."); *see also, e.g.*, *In re Accent Delight*, 791 F. App'x at 251 ("Sotheby's has not provided any showing that the policy or restrictions of any relevant foreign jurisdiction prohibit the discovery sought by Petitioners."); *In re Hansainvest Hanseatische Inv. GmbH*, 364 F. Supp. 3d 243, 251 (S.D.N.Y. 2018) (Sullivan, J., sitting by designation) ("Respondents must illustrate not merely that the requested documents are not obtainable through German procedures, but that Applicants are engaged in a bad faith endeavor to misuse Section 1782."). *Compare Metallgesellschaft*, 121 F.3d at 80 ("[W]e will not speculate—particularly on the basis of an ambiguous affidavit submitted by [respondent's] German counsel—whether Hodapp enjoys a privilege under German law entitling him to refuse to comply with a discovery order under § 1782."), *with*

---

[5] Akin notes that the Report, in one instance, previewed its findings as to *Intel* factors two and three by noting a lack of "authoritative proof." *See* Report at 35; Akin Obj. at 19.  It argues that the caselaw has generally employed this terminology to describe the respondent's burden of proof under factor two (but not factor three).  Akin Obj. at 19–20.  Even assuming *arguendo* that the respondent's burden were lower under factor three, that distinction is academic here, given the Report's bottom-line conclusion that there was no "proof"—authoritative or otherwise—"that providing discovery to Petitioner puts Respondents at risk of violating foreign sanctions law." Report at 36.

*Schmitz*, 376 F.3d at 82, 84 (application properly denied where German Ministry of Justice had asked district court to deny discovery, because it would "jeopardize" "the ongoing German criminal investigation" and "German sovereign rights").

Accordingly, Akin's objection based on the third *Intel* factor fails.

### C.    *Kiobel*'s Holdings as to Obtaining Discovery from Law Firms

Akin next argues that the Report's evaluation of the *Intel* factors "overlooked" or "misapplied" the Second Circuit's decision in *Kiobel*. Akin Obj. at 9 *et passim*. The Report found, expressly applying *Kiobel*, that (1) *Intel* factor one favors Akin, but (2) the concerns animating that decision do not apply to records generated in the course of Akin's lobbying—as opposing to lawyering—efforts on behalf of Fortenova. *See supra* pp. 9–10. Akin argues that the Report should have gone further, and categorically held that the fact "that the petitioner sought discovery from a client's legal counsel was enough to deny the petition." Akin Obj. at 14.

To the extent Akin construes *Kiobel* to work a blanket prohibition on obtaining discovery from the law firm of a foreign-litigation adversary, *see* Akin Obj. at 10–11, 14, Akin misreads *Kiobel*. The Second Circuit did not confront there a law firm which exercised a separate lobbying function on behalf of the client. And it did not paint with the broad brush that Akin imagines. Its decision instead followed from the circumstances of that case, which arose out of a multi-jurisdictional dispute spanning over a decade.

Esther Kiobel had initially sued Royal Dutch Shell ("Shell") in the United States under the Alien Tort Statute, 28 U.S.C. § 1350. *See Kiobel*, 895 F.3d at 240–41. The law firm Cravath Swaine & Moore ("Cravath") represented Shell in that litigation (the "ATS litigation"). *Id.* After the ATS litigation was dismissed, *see Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 114 (2013), Kiobel decided to sue Shell in the Netherlands. To assist in the contemplated Dutch

proceedings, Kiobel filed a § 1782 petition in this District, seeking documents of Shell in

Cravath's hands. *See Kiobel*, 895 F.3d at 240–41. Cravath had custody of these documents

because of its prior representation of Shell in connection with the ATS litigation. *Id.* It had

previously produced those documents to Kiobel, but pursuant to a stipulated protective order that

restricted their use to the U.S. litigation.[6] *Id.* at 241. The protective order required the parties to

destroy or return each other's confidential material within 30 days after the respective cases'

conclusions. *Id.* The documents were not discoverable from Shell in the Netherlands due to

more restrictive Dutch discovery protocols. *See id.* at 246.

      The district court granted Kiobel's § 1782 petition, finding it satisfied the statutory and

discretionary factors. *See id.* at 242–43, 244–45. The protective order in the ATS litigation

remained an obstacle, however, to Kiobel's use, in the contemplated Dutch proceedings, of the

documents sought by the petition. The documents in Cravath's possession were designated as

"confidential" and the protective order limited their use to the ATS litigation; its restrictions

survived the ATS litigation. *Id.* at 241. As a work-around, the district court required the parties

"to sign a new stipulation," under which the documents produced by Cravath could be used by

Kiobel "for drafting court papers in the contemplated Dutch proceedings" but "not for publicity."

*Id.* at 242. In the event Kiobel breached the new stipulation, Shell lacked the ability to enforce

the confidentiality terms in the district court, because it was not a party in the § 1782

proceedings. *Id.* at 242–43.

      The Second Circuit reversed. Its decision termed Kiobel's petition an "extraordinary, and

possibly unique" gambit to use § 1782 to circumvent the protective order. *Id.* at 246–47. And,

apart from that troubling feature of the petition, the Circuit held, the first and third *Intel* factors

---

[6] Kiobel signed the stipulated protective order. *See Kiobel*, 895 F.3d at 241.

weighed decisively against Kiobel's petition. The first factor disfavored Kiobel because "the real party" from whom documents were sought—Shell—was "involved in foreign proceedings" and "the need for § 1782 help is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Id.* at 245 (citing *Schmitz*, 376 F.3d at 85). And the third *Intel* factor disfavored Kiobel's petition because "statements made by [her] counsel demonstrate[d] that Kiobel [wa]s trying to circumvent the Netherlands' more restrictive discovery practices." *Id.* Reiterating that the *Intel* factors are "not to be applied mechanically," the Circuit expressed, with force, its concern that Kiobel's petition aimed to end-run the protective order. *Id.* Because the documents sought by the petition were covered by the protective order and because there is "a strong presumption against the modification of a protective order," the Circuit held, the district court's "decision to alter the confidentiality order without Shell's participation, and without considering the costs of disclosure to Shell, ma[d]e this case *exceptional*, and mandate[d] reversal." *Id.* at 247 (emphasis added).

Thus, contrary to Akin's reading, *Kiobel* did not deny the petition merely because it sought discovery from the law firm of Kiobel's foreign-litigation adversary. And courts in this Circuit have not read or applied *Kiobel* to work a blanket prohibition on discovery from law firms. Rather, they have inquired, in a fact-sensitive manner, whether granting discovery would offend the legal system's interests in preserving the sanctity of protective orders and attorney-client relations, the concerns noted by the Circuit by *Kiobel*. In *In re Lane*, Judge Schofield granted a petition for discovery from a law firm where, as here, *Intel* factors two, three, and four favored production. No. 22 Misc. 0034, 2022 WL 16737132, at *3–5 (S.D.N.Y. Nov. 7, 2022). That the subpoena was directed to the law firm of petitioner's foreign-litigation adversary disfavored discovery under *Intel* factor one, but it was not dispositive. *See id.* at *3. On the

contrary, Judge Schofield noted, the concerns in *Kiobel* related to "restrictions on gathering evidence in the foreign proceeding and the existence of a protective order" were absent. *Id.* at *4. And, she found, any "risk of turning over privileged materials" could be addressed "through privilege logs." *Id.* She thus held § 1782 discovery was appropriate. *Id.* at *3–5. Similarly, *In re Degens* granted § 1782 discovery from U.S. law firms. No. 20 Misc. 237, 2020 WL 4252725, at *1 (S.D.N.Y. July 24, 2020). There, in connection with a matrimonial dispute in Brazil, the petitioner had sought documents from law firms that had advised her former partner on the administration of his offshore assets. *Id.* at *1. Emphasizing that "law firms are not immune from discovery," Magistrate Judge Lehrburger found that the business-related work that the law firms had performed did not implicate concerns regarding attorney-client privilege and attorney work product. *Id.* at *6. For that reason, it accorded with *Kiobel* to authorize discovery.

In contrast, *In re Warren*'s fact pattern closely resembled that of *Kiobel* and warranted denying the § 1782 petition. *See* 20 Misc. 208, 2020 WL 6162214 (S.D.N.Y. Oct. 21, 2020). There, Judge Gardephe barred discovery from a law firm, which, as in *Kiobel*, had "c[o]me into possession of [the] documents solely as a result of its representation of [the client] in connection with" prior litigation, and the documents were subject to a protective order. *Id.* at *10. For this reason, Judge Gardephe found *Kiobel* controlling: "[T]he primary concern that motivated the *Kiobel* court—that documents of a foreign entity would become discoverable under Section 1782(a) solely because they were produced by the foreign entity to its U.S. counsel in connection with U.S. litigation [wa]s present." *Id.* Other cases with similar facts have denied § 1782 discovery. *See, e.g., In re Alghanim*, No. 21 Misc. 167, 2022 WL 1423088, at *3–5 (S.D.N.Y. May 5, 2022) (Swain, C.J.) (denying discovery from law firm where petition had "every

22

indication of being an archetypal fishing expedition" and *Intel* factors one, three, four, and

*Kiobel*'s policy concerns weighed against production); *In re Hulley Enters., Ltd.*, 358 F. Supp. 3d

331, 351–54 (S.D.N.Y. 2019) (Gorenstein, M.J.) (denying petition after finding that

"inexcusabl[e]" delay on petitioners' part, along with *Intel* factor four, disfavored discovery from

law firm).

Akin is thus wrong to argue that *Kiobel* requires an outright denial of the Petition merely

because Akin represented Fortenova, in part, as a law firm. *Kiobel* did not so hold. And Akin's

attempt to read *Kiobel* to shield from § 1782 discovery its separate lobbying function, which is

akin to the business-advisory function of the firm in *In re Degens* as to which discovery was held

appropriate, does not follow from any aspect of that decision.

For three reasons, the Court holds, *Kiobel* is inapposite, and does not provide a basis for

Akin's objection to the targeted discovery into lobbying services authorized by the Report.

First, authorizing discovery from Akin would not work an end run around a protective

order—a central concern animating *Kiobel*. Because the documents that Cravath held were

subject to a protective order, the Second Circuit stated, "[t]he decision to alter the confidentiality

order without Shell's participation, and without considering the costs of disclosure to Shell,

*makes this case exceptional*, and mandates reversal." *Kiobel*, 895 F.3d at 247 (emphasis added);

*see id.* ("Without protective orders, 'litigants would be subject to needless annoyance,

embarrassment, oppression, or undue burden or expense.'" (quoting *SEC v. TheStreet.Com*, 273

F.3d 222, 229 (2d Cir. 2001))). "Overrid[ing] the confidentiality order," the Circuit held, would

imperil "full and frank communication between attorneys and their clients,' which 'promote[s]

broader public interests in the observance of law and administration of justice.'" *Id.* (quoting

*Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). In contrast, the documents whose

production the Report would authorize are not covered by a protective order. The Petition thus does not implicate *Kiobel*'s concern that "overrid[ing]" protective orders to facilitate § 1782 discovery would inhibit "foreign companies . . . from producing documents to U.S. law firms, even under a confidentiality order, lest Section 1782 become a workaround to gain discovery," *id.*

Second, the Petition here, unlike that in *Kiobel*, does not seek from a law firm internal corporate documents of its client that are "in counsel's hands solely because they were sent to the United States for the purpose of American litigation." *Id.* at 241. To the contrary, the Petition does not seek *any* documents prepared for U.S. litigation. Rather, as noted, discovery here, as the Report importantly narrows it, would be limited to documents independently created by Akin as a lobbying agent of Fortenova. *See In re BM Brazil 1 Fundo de Investimento em Participações Multistratégia*, No. 23 Misc. 208, 2024 WL 555780, at *10 (S.D.N.Y. Jan. 18, 2024) (distinguishing between subpoenaed party's "own business records" and records of the party before the foreign court proceeding); *In re Batbold*, No. 21 Misc. 218, 2023 WL 2088524, at *5 & n.1 (S.D.N.Y. Feb. 17, 2023) (collecting cases). Akin's attempt to analogize the Akin Opinion—a lobbying document allegedly intended to sway outside opinion—to the confidential corporate documents in *Kiobel* is highly unpersuasive. Fortenova affirmatively used the Akin Opinion as a sword in proceedings before the EU Council. The EU Council relied upon it as a basis to impose sanctions on SBK. In contrast, the documents sought in *Kiobel* were not used offensively, but in Cravath's hands solely because it represented Shell in prior U.S. litigation. As the Report recognized, Fortenova's "public use of the Akin Opinion means that the work relating to the Akin Opinion and Mr. Alketbi's acquisition of [SBK] becomes something more like the discoverable work of a lawyer acting as a lobbyist or business advisor." Report at 46–

57. And Akin has not substantiated its claim that the Petition interferes with the lawyer-client relationship. Given the important limits that the Report would place on discovery, which restrict discovery of non-publicly-disclosed materials to materials arising from lobbying work, and given §1782(a)'s preservation of legally applicable privileges, there is no discernible basis for that objection.[7]

Third, even assuming *arguendo* that the Petition implicated *Kiobel*'s policy concern that discovery from law firms would chill attorney-client communications, the thoughtful discovery limitations that the Report recommends ably address that concern. Critically, it limits document discovery to "non-privileged" materials that are "uniquely possessed by Akin or that have been shared with third parties other than Fortenova Group." *Id.* And it limits such materials to those implicating topics closely tailored to SBK's litigation needs: (1) Alketbi's acquisition of SBK; (2) the Akin Opinion; and (3) the Corporate Changes. Likewise, with respect to the Petition's request for testimony from Akin, the Report limits it to a single deposition on these topics and Akin's production. Temporally, too, the scope of discovery is narrow, from February 1, 2022 to December 31, 2023—to wit, from shortly before Alketbi's acquisition of SBK to shortly after the Corporate Changes. These parameters together focus discovery on non-privileged, publicly shared lobbying material. With these limitations, the discovery at issue ought not implicate the policy concerns that *Kiobel* found to counsel restraint.

---

[7] To the extent that Akin represented at argument before Judge Tarnofsky that some responsive documents may be covered by the attorney-client privilege, Akin's remedy is to prepare a log that enumerates, on a document-specific basis, its privilege claims. *See United States v. Constr. Prods. Rsch., Inc.*, 73 F.3d 464, 473 (2d Cir. 1996) ("To facilitate its determination of privilege, a court may require an adequately detailed privilege log in conjunction with evidentiary submissions to fill in any factual gaps." (citation omitted)).

Important, too, as to this discretionary factor, Akin remains at liberty to file non-frivolous overbreadth objections to particular subpoena calls. To the extent a particular demand might be indelicately formulated, such would permit further tailoring on a request-specific basis. *See, e.g.*, *In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios S.A.*, No. 24 Misc. 348, 2025 WL 40783, at *4 (S.D.N.Y. Jan. 7, 2025) ("[S]ubpoenas are not so incurably broad and burdensome that they must be quashed outright."); *Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 252 (S.D.N.Y. 2018) (similar); *cf. In re Chevron Corp.*, 749 F. Supp. 2d 141, 166–68 (2010) ("[W]ell-established procedure for the invocation of alleged privileges in response to subpoenas and other demands for tangible evidence" is "to allow the process to go forward and to adjudicate the claims of privilege in due course."). The Report recognized this avenue of relief, noting the parties' ability, subject to judicial supervision, to modulate the burdens generated by specific requests. In this respect, Akin is wrong to assert that the Report "overlooked the importance of *Kiobel* in [its] analysis of the fourth *Intel* factor." Akin Obj. at 16. To the extent Akin voices concern about the volume of materials to be reviewed for responsiveness, the Court, as with all civil discovery, expects the parties to negotiate search terms that would avoid excessive burdens on producing party. *See In re Accent Delight Int'l*

*Ltd.*, No. 16 Misc. 125, 2018 WL 2849724, at *5 (S.D.N.Y. June 11, 2018) (authorizing the

same), *aff'd*, 791 F. App'x 247 (2d Cir. 2019).[8]

## CONCLUSION

For the foregoing reasons, the Court adopts the Report and rejects Akin's objections to

the Report. The Court accordingly grants the Petition in part and denies it in part.

---

[8] Insofar as Akin, in seeking wholesale denial of the Petition, claims that the Report overlooked the overall burden presented by the narrowed discovery it authorized, the Report heeded the governing standards. To "assess whether the discovery sought is overbroad or unduly burdensome," a court must "apply[] the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302. "[W]hether a request is intrusive or burdensome should not be assessed based on the 'discovery scope' available in the foreign proceeding." *Id.* Rule 26(b)(1) provides that the scope of discovery is limited to "relevant" material that is "proportional to the needs of the case . . . and whether the burden or expense of the proposed discovery outweighs its likely benefit," among other factors. *Elvis Presley Enters.*, 2016 WL 843380, at *5. "Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Vaigasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016). "[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Euromepa*, 51 F.3d at 1101.

The Report here, sensitive to Akin's burden claims, applied those standards. It significantly limited the requested discovery, and found that the burden presented the approved discovery justified by the needs of SBK's foreign litigation, which, aims to recoup approximately 500 million euros in losses alleged suffered by SBK as a result of the Corporate Changes. *Compare In re BM Brazil 1 Fundo de*, No. 23 Misc. 208, 2024 WL 555780, at *17 (that production would require a "labor-intensive search of thousands of documents some of which may have to be redacted" was insufficient to demonstrate undue burden), *and In re Rodriguez Guillen*, 20 Misc. 102, 2020 WL 3497002, at *3 (S.D.N.Y. June 29, 2020), *with In re Petition of MT "BALTIC SOUL" Produktentankschiffahrtsgesellschaft mgH & Co. KG*, No. 15 Misc. 319 , 2015 WL 5824505, at *3 (S.D.N.Y. Oct. 6, 2015) ("[T]he only potentially appropriate discovery purpose Petitioners have identified is adjudication of the issue of the affiliates' alter ego status. Their request for disclosure of every financial transaction these companies have engaged in with 11 different banks, along with considerable additional financial information, sweeps far too broadly to be proper for that limited purpose."), *and In re Ex Parte Application of Apotex Inc. for Order to Obtain Discovery for Use in Action Pending Before the Federal Court in Canada*, No. M-12-160, 2009 WL 618243, at *3 (S.D.N.Y. Mar. 9, 2009) (denying petition that would have required respondent "to devote substantial resources to perform onerous searches and then review voluminous documents for a potentially small subset of . . . documents that date back nearly thirty years").

The Clerk of Court is respectfully directed to terminate all pending motions and to close this case, subject to the right of the parties to seek to reopen it for the limited purpose of seeking judicial resolution of discrete discovery disputes (*e.g.*, privilege objections).

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: May 30, 2025
       New York, New York