**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE EX PARTE APPLICATION OF SBK ART LLC, *Petitioner*, for an order pursuant to 28 U.S.C. § 1782 to conduct discovery for use in foreign proceedings | Case No. 1:24-mc-00147-PAE-RFT |

**MEMORANDUM OF LAW IN SUPPORT OF RESPONDENT'S**
**MOTION TO STAY SECTION 1782 DISCOVERY PENDING APPEAL**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT.................................................................................................1

BACKGROUND ..................................................................................................................3

    **A.** Fortenova, Akin, and SBK ...............................................................3

    **B.** The Petition, R&R, and Order ...........................................................5

LEGAL STANDARD ...........................................................................................................7

ARGUMENT ......................................................................................................................8

    **I.** AKIN HAS A SUBSTANTIAL POSSIBILITY OF SUCCESS ON THE MERITS.........8

        **A.** Foreign Discoverability of Law Firm Documents Under *Kiobel* ...........................9

        **B.** Role as Counsel Under *Kiobel* ...................................................................14

    **II.** RESPONDENT WILL BE IRREPARABLY INJURED ABSENT A STAY ...................16

    **III.** A STAY WILL NOT SUBSTANTIALLY INJURE PETITIONER.................................19

    **IV.** THE PUBLIC INTEREST FAVORS A STAY PENDING APPEAL .............................21

CONCLUSION....................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accent Delight Int'l Ltd.*,
No. 18-MC-50 (JMF), 2018 WL 7473109 (S.D.N.Y. June 27, 2018)..........................7, 11, 16

*Ex Parte Application of B&C KB Holding GmbH*,
No. 22-mc-00180, 2023 U.S. Dist. LEXIS 28406 (S.D.N.Y. Feb. 16, 2023) ...........................8

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012)...............................................................................................10

*Brenntag Int'l Chems., Inc. v. Bank of India*,
175 F.3d 245 (2d Cir. 1999)..............................................................................................16

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010).................................................................................................8

*In re Degens*,
2020 WL 4252725 (S.D.N.Y. July 24, 2020) .........................................................................13

*In re del Valle Ruiz*,
939 F.3d 520 (2d Cir. 2019)..............................................................................................22

*EM Ltd. v. Republic of Argentina*,
695 F.3d 201 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML
Capital, Ltd.,* 573 U.S. 134 (2014) ........................................................................................7

*In re Erie County*,
473 F.3d 413 (2d Cir. 2007)...............................................................................................18

*In re Gorsoan Ltd.*,
2020 WL 4194822 (S.D.N.Y. July 21, 2020) ....................................................................8, 16

*In re Hansainvest Hanseatische Inv.-GmbH*,
No. 18-MC-310 (ALC), 2019 WL 5939860 (S.D.N.Y. Oct. 4, 2019).......................................7

*Hilton v. Braunskill*,
481 U.S. 770 (1987)............................................................................................................7

*In re Hulley Enters., Ltd.*,
358 F. Supp. 3d 331 (S.D.N.Y. 2019).............................................................................12, 13

*Jock v. Sterling Jewelers, Inc.*,
738 F. Supp. 2d 445 (S.D.N.Y. 2010).............................................................................8, 16

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP,*
    895 F.3d 238 (2d Cir. 2018)..................................................................... *passim*

*In re Lane,*
    2022 WL 16737132 (S.D.N.Y. Nov. 7, 2022) ....................................................12, 13

*LaRouche v. Kezer,*
    20 F.3d 68 (2d Cir. 1994).................................................................................8

*In re Martinez Sampedro,*
    2020 WL 1158701 (D. Conn. Jan. 16, 2020) ....................................................18, 19

*Mees v. Buiter,*
    793 F.3d 291 (2d Cir. 2015)............................................................................11, 13

*Mohammed v. Reno,*
    309 F.3d 95 (2d Cir. 2002)............................................................................7, 19

*Pearson v. Trinklein,*
    2022 WL 1315611 (S.D.N.Y. May 3, 2022) .......................................................13

*In re Platinum Partners Value Arbitrage Fund L.P.,*
    2018 WL 3207119 (S.D.N.Y. June 29, 2018) .......................................................16

*Ratliff v. Davis Polk & Wardwell,*
    354 F.3d 165 (2d Cir. 2003)............................................................................10, 14

*Application of Sarrio, S.A.,*
    119 F.3d 143 (2d Cir. 1997) ...........................................................1, 9, 10, 14, 17

*SEC v. Citigroup Glob. Mkts. Inc.,*
    673 F.3d 158 (2d Cir. 2012)............................................................................7, 21

*Thapa v. Gonzales,*
    460 F.3d 323 (2d Cir. 2006)............................................................................7

**Statutes**

28 U.S.C. § 1782.................................................................................... *passim*

**Other Authorities**

Fed. R. App. P. 8(a)(1)(A) ............................................................................1

Fed. R. Civ. P. 45.......................................................................................16

Respondent Akin Gump Strauss Hauer & Feld LLP ("Respondent" or "Akin"), pursuant to Fed. R. App. P. 8(a)(1)(A) and this Court's inherent authority, respectfully submits this Memorandum in Support of its Motion to Stay this Court's May 30, 2025 Order (ECF No. 57) (the "Order"), granting in part and denying in part Petitioner SBK ART LLC's ("Petitioner" or "SBK") application for discovery under 28 U.S.C. § 1782, pending appeal.

## PRELIMINARY STATEMENT

A stay pending appeal is necessary to prevent irreparable harm to Akin, an international law firm whose client files are at risk of being disclosed in multiple foreign proceedings before the Second Circuit can resolve the important issues presented by this case. The Order permits SBK to demand from Akin's New York office documents created and located abroad, which relate to Akin's foreign offices' representation of a foreign client. After Akin timely filed a notice of appeal from the Order, SBK served it with a subpoena demanding extensive discovery of sensitive client materials, including fifteen categories of documents and a deposition. A stay is necessary to preserve the Second Circuit's opportunity to resolve important legal questions that have divided district courts over the protection afforded to the attorney-client relationship in Section 1782 discovery.

Akin satisfies the four-factor test for a stay. *First*, Akin is likely to succeed on appeal— and at least presents substantial questions or matters of first impression. In *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238 (2d Cir. 2018), the Second Circuit recognized that, under a principle that "protect[s] documents regardless of their content," "a district court should not exercise its discretion to grant a Section 1782 petition for documents held by a U.S. law firm in its role as counsel for a foreign client if the documents are undiscoverable from the client abroad, because this would disturb attorney-client communications and relations." *Id.* at 246 (citing *Application of Sarrio, S.A.*, 119 F.3d 143, 146 (2d Cir. 1997)). While *Kiobel*'s discussion

1

implicates every US law firm with global operations, that case involved documents sent to a US law firm for use in litigation under a protective order. In the seven years since *Kiobel* was decided, district courts have grappled with how to apply it to countless other circumstances where US law firms possess documents relating to the representation of a foreign client. But without a stay, the Second Circuit will not be given the chance to provide the clear guidance that is lacking across that dizzying array of district court decisions.

*Second*, Akin will be irreparably harmed if it is forced to produce documents before its appeal is resolved. Absent a stay, the attorney-client relationship that the Second Circuit stepped in to protect in *Kiobel* would be incurably damaged at the moment of disclosure, even if Akin ultimately prevails on appeal. That harm cannot be meaningfully mitigated through the discovery process: As a legal matter, the *Kiobel* protection is distinct from the attorney-client privilege that may shield the contents of particular documents; and as a factual matter, the Court lacks the authority to control how SBK—a Russian-based foreign entity with no US presence—would handle those documents once they are sent abroad.

*Third*, SBK will suffer no injury from a stay. There are no impending deadlines or milestones in either of the foreign proceedings in which SBK purports to need Akin's documents. In fact, recent developments in both cases (not factored into the Order) suggest that even if Akin produced every responsive document covered by the subpoena today, the possibility that SBK would *ever* be able to use those documents in a foreign proceeding is almost non-existent. No exigency warrants rushing discovery on a petition that SBK filed more than fifteen months ago concerning underlying events that occurred years ago.

*Fourth*, the public interest weighs in favor of a stay. *Kiobel* underscores the importance of protecting the relationships between US law firms and their foreign clients. The issues Akin will

raise on appeal will clarify *Kiobel*'s reach and provide sorely needed certainty regarding the discoverability of documents accessible to US law firms. But law firms and their clients will be deprived of that guidance if Akin's appeal is rendered moot. By contrast, denying Akin a meaningful opportunity to appeal will not serve the public interest, as neither the foreign proceedings nor the documents SBK seeks have any nexus with the United States. Allowing intrusive discovery simply because Akin's US offices share information systems with Akin's foreign offices risks forcing US firms with foreign clients to store documents and servers abroad— *i.e.*, precisely the "excessive costs to law firms and clients" against which *Kiobel* cautioned. Worse yet, this use of Section 1782 could cause foreign companies to shun US law firms altogether.

The Court should stay its order pending appeal.

## BACKGROUND

### A.  Fortenova, Akin, and SBK

Fortenova is a major food and retail company based in Croatia, with operations in several countries in southeastern Europe.[1] Akin is a multinational law firm. Attorneys in Akin's London office have served as English law counsel to Fortenova on a variety of legal matters since 2019.

Sberbank is a Russian financial institution owned by the Russian Federation. It became one of Fortenova's largest creditors in 2019. Following the illegal Russian invasion of Ukraine in April 2022, Sberbank was added to the sanctions list for the US, EU, and UK. Around the same time, Sberbank placed its Fortenova holdings into a wholly owned special purpose vehicle, SBK. In October 2022, Sberbank purported to transfer 100% of its interests in SBK to an individual named H.E. Saif Jaffar Suhail Markhan Alketbi. Notwithstanding Mr. Alketbi's purported

---

[1] The underlying facts are set forth more fully at pages 3-8 of Akin's Objection (ECF No. 51) to the Report and Recommendation ("R&R," ECF No. 46) issued by Judge Tarnofsky. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Akin's Objection and the Order.

acquisition of SBK, in December 2022, the EU Council added SBK to its list of sanctioned entities, on the grounds that (1) Sberbank still retained "effective control" over SBK and (2) Sberbank had rendered financial assistance to the Russian Federation.

Beginning in early 2022, Fortenova faced significant problems because Sberbank and SBK were equity owners in the company and potentially subject to sanctions. As such, certain of Akin's legal advice to Fortenova related to Fortenova's connection to SBK. This included a legal memorandum dated December 14, 2022, prepared by Akin lawyers in London, providing advice and analysis to Fortenova regarding the sanctioned status of Sberbank and SBK and the legal risks posed by their relationship to Fortenova (the "Akin Opinion"). Specifically, the Akin Opinion stated that Akin had "been asked to conduct a review of the documents received from [Mr. Alketbi] and [SBK] for [Know Your Customer] purposes in connection with the purported sale and transfer of the SBK shares from [Sberbank] to Mr. Alketbi and related transactions." *See* ECF 4-4 at 1. After providing an executive summary and background on the transaction at issue in its first two chapters, the third and final chapter of the Akin Opinion "set[] out the substantive legal provisions, including the legal test applied in the review, as well as the reasons why [Akin] conclude[d] that the transactions at issue require application of an enhanced standard of review which require[d] additional information." *See id.*

Akin's London lawyers also worked on matters regarding corporate governance and the assessment of potential transactions that would enable Fortenova to operate as a going concern, including the sale of MidCo, one of Fortenova's holding companies, to existing non-sanctioned stakeholders.

Apparently discontent with the economic and geopolitical realities that necessitated the MidCo sale, SBK launched a widespread litigation attack on Fortenova, its affiliates, and its

service providers, including to seek damages in connection with Fortenova's corporate governance changes, to block the MidCo sale from proceeding, and to challenge its own sanctioned status. Unable to gain any traction against Fortenova in the multiple foreign proceedings, SBK pivoted to seeking Section 1782 discovery from Fortenova's lawyers and other professionals, who happened to have offices in the US, to use against Fortenova abroad.

**B.    The Petition, R&R, and Order**

On March 26, 2024, SBK filed its Section 1782 petition (the "Petition") seeking discovery purportedly for use in two ongoing foreign proceedings and one hypothetical action: (1) the EU Action, which SBK initiated in the General Court of the EU to try to reverse its sanctions designation; (2) the Malta Action, which SBK initiated against Fortenova in the Civil Court of Malta in August 2023 for "damages caused to SBK ART by the approval of the changes to the corporate governance in Fortenova Group"; and (3) the Anticipated Litigation, which SBK described as a "potential new claim" that it intends to file in the Netherlands or "another foreign court" to seek "damages caused by the most recent sale of MidCo." Petition at 3. Although not the basis for its Petition, SBK is currently pursuing multiple other actions against Fortenova on similar legal theories in the Netherlands, where it has had no success to date.

Akin opposed the Petition. On July 20, 2024, following briefing and oral argument, Judge Tarnofsky issued the R&R recommending that this Court grant the Petition in part, subject to proposed limitations on the scope of discovery. Specifically, the R&R recommended narrowing the scope of discovery to non-privileged materials uniquely possessed by Akin or shared with third parties other than Fortenova, between February 1, 2022 and December 31, 2023, related to: (1) Mr. Alketbi's acquisition of SBK; (2) the Akin Opinion; and (3) the Corporate Changes. *See* R&R at 43-44. The "Corporate Changes" were described in the Petition and the R&R as the changes to the corporate governance of Fortenova that were proposed at a January 12, 2023 meeting of

Fortenova's equity holders, and approved by the same.  SBK alleges that these "Corporate Changes" allowed another Fortenova shareholder to secure control of Fortenova.  *Id.* at 4-5.

On August 27, 2024, Akin filed its Objections to the R&R.  On September 20, 2024, SBK responded to the Objections ("Response," ECF No. 55).  On May 30, 2025, this Court issued an Order adopting the R&R in full, thereby granting the Petition in part and denying it in part pursuant to the limitations set forth by Judge Tarnofsky in the R&R.[2]  On June 20, 2025, Akin filed a timely notice of appeal from the Order.  *See* ECF No. 58.

Three days later, SBK served a modified subpoena on Akin ("Subpoena," ECF No. 59). The purportedly narrowed Subpoena demands documents in response to fifteen separate requests related broadly to the "SBK Transaction, the Corporate Changes, and/or the Akin Opinion," and deposition testimony on seven topics, exclusive of subparts.  For example, the subpoena seeks "[a]ll Communications … concerning the SBK Transaction, the Corporate Changes and/or the Akin Opinion" between Akin and a long list of entities and individuals, including foreign legal counsel to Fortenova, other professional advisors to Fortenova abroad, and even Fortenova's CEO. *See* Subpoena, Schedule B, Request Nos. 4-15.  Additionally, SBK seems to have expanded the definition of "Corporate Changes," from "the changes to the corporate governance of Fortenova that were proposed at a January 12, 2023 meeting of Fortenova's equity holders, and approved by the same," as defined in the R&R (*see* R&R at 4-5), to "the corporate reorganization of the Fortenova Group in favor of Open Pass Limited and its owners, first approved at a meeting on or about January 12, 2023, and subsequently closed on July 9, 2024," which effectively covers Akin's work on Fortenova's entire restructuring during that period.

---

[2] The R&R recommended that "that Petitioner be authorized to serve on Respondents subpoenas that are modified as described herein."  R&R at 48.

## **LEGAL STANDARD**

"A district court has broad latitude to determine the scope of discovery and to manage the discovery process." *EM Ltd. v. Republic of Argentina,* 695 F.3d 201, 207 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.,* 573 U.S. 134 (2014).

The traditional stay factors are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *SEC v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 162-63 (2d Cir. 2012) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). However, on a motion to stay pending appeal, "a movant can satisfy this [test] where substantial legal questions or matters of first impression are at issue and the equities favor maintaining the status quo." *In re Accent Delight Int'l Ltd.*, No. 18-MC-50 (JMF), 2018 WL 7473109, at *1 (S.D.N.Y. June 27, 2018) (citation omitted); *see, e.g.*, *In re Hansainvest Hanseatische Inv.-GmbH*, No. 18-MC-310 (ALC), 2019 WL 5939860, at *3 (S.D.N.Y. Oct. 4, 2019) ("Courts within this district have stated that an appeal that presents an issue of first impression satisfies the merits prong of the analysis."). That is because the Second Circuit "treat[s] these criteria somewhat like a sliding scale," so "the necessary level or degree of possibility of success will vary according to the court's assessment of the other stay factors." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (citation modified); *see Mohammed v. Reno*, 309 F.3d 95, 100-01 (2d Cir. 2002) (indicating same sliding-scale standard governs "stay of an order of a district court or an administrative agency pending appeal"). "Simply stated, more of one excuses less of the other." *Thapa*, 460 F.3d at 334 (quoting *Mohammed*, 309 F.3d at 101).

All four factors weigh in favor of granting a stay pending appeal here.

## ARGUMENT

### I.    AKIN HAS A SUBSTANTIAL POSSIBILITY OF SUCCESS ON THE MERITS

To satisfy the first stay factor, Akin must show a "'substantial possibility' of success." *Ex Parte Application of B&C KB Holding GmbH*, No. 22-mc-00180 (LAK-VF), 2023 U.S. Dist. LEXIS 28406, at *3 (S.D.N.Y. Feb. 16, 2023). "This factor does not require 'that the movant is more likely than not to succeed.'" *Id.* (quoting *In re Gorsoan Ltd.*, 2020 WL 4194822, at *5 (S.D.N.Y. July 21, 2020)).

Instead, even if the Court "remains confident in the soundness of the reasons" underlying the Order, it should stay discovery pending appeal because the Court of Appeals "may disagree" with it over serious questions or issues of first impression. *See Jock v. Sterling Jewelers, Inc.*, 738 F. Supp. 2d 445, 447 (S.D.N.Y. 2010) (holding that "the plaintiffs have sufficiently demonstrated a likelihood of success on the merits" where the plaintiffs' appeal presented an issue of first impression); *LaRouche v. Kezer*, 20 F.3d 68, 72-73 (2d Cir. 1994) (holding a stay may issue if "a serious legal question is involved" and the movant "present[s] a substantial case on the merits . . . and show[s] that the balance of the equities weighs heavily in favor of granting the stay") (citation omitted); *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 37-38 & n.8 (2d Cir. 2010) (reaffirming Circuit's "serious questions" standard that governs the "likelihood of success" inquiry under the "overlapping" preliminary-injunction test).

On appeal, Akin will raise multiple issues pertaining to the application of *Kiobel*, each of which has a substantial possibility of success. In *Kiobel*, the Second Circuit denied discovery of documents held by a US law firm in connection with the representation of a foreign client. 895 F.3d at 240-41. Even though the documents were not covered by the attorney-client or work-product privileges, the Second Circuit recognized a related but distinct protection based on a "policy of promoting open communications between lawyers and their clients." *Id.* at 241 (quoting

8

*Sarrio*, 119 F.3d at 146). Absent such protection against discovery in this context, "foreign entities may simply be less willing to engage with U.S. law firms." *Id.* at 248.

*Kiobel*'s underlying policy concerns apply broadly to countless circumstances in which US law firms may hold or access files related to foreign client representations. But in addition to articulating a concern for protecting the attorney-client relationship generally, the Second Circuit expressed particular concern that the documents at issue in *Kiobel* were covered by a protective order agreed to in prior US litigation. That factual circumstance has caused uncertainty regarding the reach of the Second Circuit's holding since it was decided more than seven years ago. The differing outcomes at the district court level show that further guidance is needed on at least two critical issues raised in this case: (1) whether the scope of the *Kiobel* protection is shaped by the foreign discoverability of the sought-after materials, not simply by the existence (or not) of a prior protective order; and (2) when a law firm may (and may not) invoke the *Kiobel* protection in its "role as counsel" to a foreign client.

### A. Foreign Discoverability of Law Firm Documents Under *Kiobel*

There is a substantial possibility that the Second Circuit will hold that *Kiobel* requires district courts to decline to compel a US law firm that serves as legal counsel to a petitioner's foreign adversary to produce client documents if "the documents are undiscoverable from the client abroad." *See Kiobel*, 895 F.3d at 246. Akin presented evidence that the Petition seeks documents that would not be discoverable in the foreign proceedings given the expansive view of privilege and confidentiality in the relevant foreign jurisdictions. The Court declined to consider it, however, holding that Akin was "mistaken" in the first instance to urge that the materials must be "discoverable under Malta or EU law." Order at 15. The Court understood various Second Circuit opinions to establish a broad principle that "a district court should not consider the discoverability of the evidence in the foreign proceeding" or the "admissibility of evidence in the

foreign proceeding in ruling on a section 1782 application."  *Id.* (quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012)).

But *Kiobel* indicates that principle applies differently when the target of discovery is a US law firm with a foreign client.  In *Kiobel*, the Second Circuit recognized that two prior Second Circuit decisions—*Sarrio* and *Ratliff*—provided a basis for shielding a law firm's documents from production via Section 1782.  895 F.3d at 245 (citing *Sarrio*, 119 F.3d at 146; *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170-71 (2d Cir. 2003)).  The Court observed that *Sarrio* first "suggest[ed] that a district court should not exercise its discretion to grant a Section 1782 petition for documents held by a U.S. law firm in its role as counsel for a foreign client <u>if the documents are undiscoverable from the client abroad</u>, because this would disturb attorney-client communications and relations."  *Id.* at 244 (citing *Sarrio*, 119 F.3d at 146) (emphasis added).  In *Ratliff*, the Second Circuit later explained the nature of the problem identified by *Sarrio* in more detail:

> Exposing documents—not otherwise subject to production—to discovery demands after delivery to one's attorney whose office was located within the sweep of a subpoena would produce a curious and unacceptable result. The price of an attorney's advice would be disclosure of previously protected matters. That 'price' would not only chill open and frank communications between attorneys and their clients, it would disenfranchise local counsel from representing foreign entities.

354 F.3d at 169.

*Kiobel* recognized that "*Ratliff* did not disturb *Sarrio*'s suggestion that a district court should not exercise its discretion to grant a Section 1782 petition for documents held by a U.S. law firm in its role as counsel for a foreign client <u>if the documents are undiscoverable from the client abroad</u>, because this would disturb attorney-client communications and relations."  895 F.3d at 246 (emphasis added).  In fact, immediately following its analysis of *Sarrio* and *Ratliff*, the Second

10

Circuit in *Kiobel* concluded that the documents at issue were undiscoverable in the foreign jurisdiction because of the confidentiality order in place *and* "the more restrictive [foreign jurisdiction] discovery practices." *Id.* In so holding, the Second Circuit seemed to recognize that courts should be concerned with the consequences of putting foreign clients—and their relationship with counsel of their choice—at risk because they engaged a law firm that happens to have a US presence.

On appeal, the Second Circuit is likely to hold that *Kiobel*'s specific consideration of foreign discoverability in the context of foreign client files accessible by US law firms overrides broad statements of foreign-discoverability principles in different, less-sensitive contexts. At a minimum, the question of under what circumstances a court should "exercise its discretion to grant a Section 1782 petition for documents held by a U.S. law firm in its role as counsel for a foreign client if the documents are undiscoverable from the client abroad," is an important issue worthy of further clarification. *Kiobel*, 895 F.3d at 246. That statement mandating a foreign-discoverability inquiry in the context of US law firms with foreign clients is plainly in tension with the principle that "Section 1782 does not have a 'foreign-discoverability rule.'" R&R at 35. Neither the R&R nor the Order analyzed foreign discoverability, with the latter concluding that "[Section] 1782 contains no foreign-discoverability requirement." Order at 15 (quoting *Mees v. Buiter*, 793 F.3d 291, 303 (2d Cir. 2015)). "[R]equirement" or not, *Kiobel* made clear that, in the law firm context, foreign discovery is an important factor to be considered—and there is thus a substantial possibility that the Second Circuit will require courts to consider foreign discoverability when the respondent is a US law firm with a foreign client.

The differing interpretations of *Kiobel* underscore the need for clarity on this issue, and should alone satisfy the "substantial possibility of success" prong. *See Accent Delight*, 2018 WL

7473109, at *1 (finding that respondent had a likelihood of success on appeal where its position aligned with other courts in the circuit, even though the district court espoused an opposite view in that case). Although some district courts have concluded, consistent with the Order here, that *Kiobel* should be read narrowly because of the unique factual circumstance presented by the protective order in that case, *see, e.g.*, *In re Lane*, 2022 WL 16737132 (S.D.N.Y. Nov. 7, 2022), others have embraced *Kiobel*'s concern for protecting the attorney-client relationship whenever the documents sought from the US law firm would not otherwise be discoverable in the relevant foreign jurisdiction. In *In re Hulley Enters., Ltd.*, 358 F. Supp. 3d 331 (S.D.N.Y. 2019), for example, the representation of the foreign client in the relevant matters was performed exclusively by one of the US law firm's foreign offices. There was no protective order or other "exceptional" circumstance in that case that would caution against disclosure from the US firm. Nevertheless, the district court denied Section 1782 discovery, relying on *Kiobel* to explain the danger in permitting discovery from a US law firm related to work performed by the firm's foreign office for a foreign client that would not be subject to discovery in the foreign jurisdiction:

> If American courts entertain applications to obtain client documents and attorney depositions from American law firms with foreign offices, it will discourage foreign clients from engaging the foreign office of an American law firm for fear that American courts would order production of documents and depositions of attorneys that might not be ordered by the country where the client is located. This would have a chilling effect on the ability of American law firms with foreign offices to provide representation to foreign clients.

*Id.* at 353 (emphasis added).

The court provided that explanation in *Hulley* after analyzing the discoverability of the documents in the jurisdiction where the foreign client and the US law firm's foreign office were located. *See id.* at 352. Because it was unclear that the documents' production could be compelled in the foreign jurisdiction, the court concluded that Section 1782 should not provide an alternative avenue to obtain the discovery through the US law firm. *See id.* The court reached that conclusion

despite its finding that the third *Intel* factor—and *Mees* in particular—weighed in favor of production. *See id.* at 347-48.

In each of the cases cited by the Order and R&R that permitted discovery from law firms following *Kiobel*, the reason those law firms had documents was quite straightforward: the firms' US offices and attorneys were actually engaged by the foreign clients involved in the foreign proceedings, and thus already had the documents in their possession. *See In re Degens*, 2020 WL 4252725 (S.D.N.Y. July 24, 2020); *In re Lane*, 2022 WL 16737132 (S.D.N.Y. Nov. 7, 2022); *Pearson v. Trinklein*, 2022 WL 1315611 (S.D.N.Y. May 3, 2022). Here, the documents would not be in or accessible from the United States but for the linking of information systems between Akin's US and international offices. Neither *Degens*, *Pearson*, nor *Lane* addressed this situation. But *Hulley* did, and it recognized that allowing Section 1782 petitioners to use the US law firm offices as a gateway to documents originally created and held in those firms' foreign offices would create the exact problem that *Kiobel* sought to prevent: exposing foreign clients to the risk of discovery simply by engaging with US law firms. *See In re Hulley*, 358 F. Supp. 3d at 353. In fact, that problem is arguably even worse in the circumstances of *Hulley* and the instant case, where allowing discovery would deter foreign clients not only from working directly with law firms in the United States, but from working with the law firms anywhere in the world that also happen to have a presence in the United States.

This case will afford the Second Circuit the opportunity to clarify the extent of its holding in *Kiobel*—as long as the Second Circuit is permitted to rule before the disputed production occurs and moots the appeal. Take, for instance, the Corporate Changes category of documents and communications SBK seeks. Those materials reflect quintessential legal work arising from Akin's "role as legal counsel." R&R at 41 (emphasis added). Akin presented reliable evidence showing

that SBK would not be able to obtain these materials through discovery against Fortenova (or Akin) in the relevant foreign jurisdictions. *See* R&R at 41-42. Yet the Order bypassed any evaluation of foreign discoverability. Allowing SBK's Subpoena to proceed here would—if the documents are not protected under attorney-client or work-product privileges—allow SBK to exploit Fortenova's relationship with Akin (and the shared server between Akin's US and foreign offices) to expose to discovery this broad swath of documents and communications relating to the entire corporate reorganization of Fortenova, including sensitive amendments to corporate governance documents regarding voting thresholds and board of director authorization. *See* SBK Brief, ECF No. 6 at 9.

In short, there is a substantial possibility that the Second Circuit will clarify that these materials (as well as the other categories of materials covered by the expansive Subpoena) should be protected under *Kiobel*'s foreign-discoverability analysis.

### B. Role as Counsel Under *Kiobel*

In addition to finding that this Court incorrectly construed *Kiobel*'s scope, there is a substantial possibility that the Second Circuit will conclude that there is no "lobbying" exception to *Kiobel*. The R&R and the Order both relied heavily on SBK's allegation that Akin held documents in its role as a lobbyist rather than its "role as counsel." *See Kiobel*, 895 F.3d at 246. But neither the R&R nor the Order cited any legal standard or precedent for determining when a law firm may (and may not) invoke *Kiobel* in its "role as counsel." In *Kiobel*, as in *Sarrio* and *Ratliff*, it was uncontested that the US law firm held the documents that were the subject of the subpoenas in their "role as counsel" for foreign clients. Here, it has always been undisputed that: (1) Akin is a law firm with offices in the United States and other countries; (2) Akin's London office performed legal services for its client relating to the subject matter that was the target of the Section 1782 Petition; and (3) attorneys performing that work did not register to lobby on

14

Fortenova's behalf in the EU or UK (or anywhere else).  To be sure, Akin did carry out limited lobbying for Fortenova in the United States, as reflected by the lobbying registrations of anyone at Akin who performed such work, but those lobbying efforts were wholly unrelated to the subject of SBK's foreign proceedings (which concern foreign activities only).

Nevertheless, in an attempt to avoid *Kiobel*, SBK claims to seek documents relating only to Akin's "lobbying" efforts.  Despite Akin's proof that its work relating to SBK was legal in nature, SBK alleges that because (i) Akin communicated with third parties during its representation, (ii) certain of Akin's work was sent to third parties, and (iii) the EU imposed sanctions consistent with the analysis in the Akin Opinion, the law firm must have actually been carrying out lobbying work in Europe.  The R&R and Order both conclude, based on these allegations, that a swath of Akin's client documents—including non-public and never-shared documents—are generally discoverable because they fall outside the attorney-client relationship that *Kiobel* protects.  *See* R&R at 46-47 ("[T]he public use of the Akin Opinion means that the work relating to the Akin Opinion and Mr. Alketbi's acquisition of Petitioner becomes something more like the discoverable work of a lawyer acting as a lobbyist or business advisor."); Order at 22.

That conclusion is inconsistent with industry practice, at odds with Fortenova's and Akin's reasonable expectations, and unsupported by any clear precedent.  The Order threatens to open broad-ranging disputes over whether a law firm holds documents in its "role as counsel," and over which party has the burden of proving that fact.  Introducing this cumbersome inquiry is particularly problematic in light of the confined process for adjudicating Section 1782 proceedings, which often includes one-sided, *ex parte* submissions.  Risks of mischief abound:  Absent further guidance from the Second Circuit, petitioners seeking documents from law firms may simply

recharacterize aspects of the firms' work as lobbying (or otherwise non-legal) to avoid application of *Kiobel*. The Second Circuit should be permitted to clarify the governing legal standard.

## II.    RESPONDENT WILL BE IRREPARABLY INJURED ABSENT A STAY

As to the second stay factor, Akin will suffer an irreparable injury absent a stay because its appeal from this Court's Order will effectively become moot if it is forced to produce its client files before the Second Circuit rules—particularly given that this Court will have no way of clawing back the documents or preventing SBK (a Russian-based foreign entity with no US presence) from using the documents abroad even if Akin were to prevail on appeal.

It is "clear that irreparable harm may exist 'where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.'" *Jock*, 738 F. Supp. 2d at 448 (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249-50 (2d Cir. 1999)). A favorable decision for Akin on appeal may eliminate, or at least significantly curtail, Akin's obligation to produce documents to SBK. Yet, without a stay, document production will likely be expected to proceed before Akin's appeal is resolved.[3]

If Akin is forced to produce documents during the pendency of its appeal, the appeal itself would be rendered meaningless, as "[t]he proverbial bell cannot be unrung" after Akin produces documents. *See Accent Delight*, 2018 WL 7473109, at *1. That harm is compounded by the unique circumstances here. While courts in this district have recognized that, standing alone, being required to produce documents may not be "generally the type of injury that is irreparable," a production that threatens "a claim of privilege or sensitivity" of the respondent may impose such

---

[3] SBK and Akin have negotiated a reasonable timeline for Akin's initial compliance with the Subpoena (e.g., raising objections, negotiating search terms, etc.), but SBK has not agreed to a stay of the Order pending appeal or to hold the subpoena in abeyance pending the resolution of this motion. Akin reserves its right to object to the Subpoena, including on overbreadth grounds, pursuant to Federal Rule of Civil Procedure 45.

harm. *In re Platinum Partners Value Arbitrage Fund L.P.*, 2018 WL 3207119, at *6 (S.D.N.Y. June 29, 2018); *see, e.g.*, *In re Gorsoan Ltd.*, 2020 WL 4194822, at *5 (S.D.N.Y. July 21, 2020) (finding that respondents faced irreparable harm where requiring production before resolution of appeal could force respondents to produce documents within scope of Fifth Amendment rights they were alleging on appeal). Akin's right to the *Kiobel* protections is not a mere "sensitivity"; it is an important protection distinct from the attorney-client privilege that could be asserted during the normal subpoena-compliance process. *See Kiobel*, 895 F.3d at 246 (distinguishing "attorney-client privilege" and "the protection discussed in *Sarrio* that would protect documents regardless of their content") (citation omitted).

The *Kiobel* protection is designed to prevent "disturb[ing] attorney-client communications and relations," and without it, "foreign entities may simply be less willing to engage with U.S. law firms." *Id.* at 246, 248. Thus it is not surprising that in *Kiobel* itself, even after granting the Section 1782 petition, the district court stayed its own order pending appeal *the day after* respondents filed a motion requesting such relief.[4] The same course is warranted here, as the very situation that *Kiobel* seeks to protect against—production of a law firm's documents to a foreign client's foreign adversary that would not be discoverable in the foreign jurisdiction itself—will occur if Akin is forced to produce documents. That will irreparably harm Fortenova, Akin, and the attorney-client relationship between the two (as well as Akin's dealings with countless other foreign clients who will worry that their communications and documents are now also at risk of discovery). Reasonable minds may disagree about how to apply *Kiobel*, but the clear injury that would befall Akin and its client if deprived of the opportunity to press that case's applicability on appeal counsel in favor of a stay.

---

[4] *See* Order Staying Respondent's Obligation to Produce Documents Pending Resolution of Respondent's Motion to Stay, *Kiobel v. Cravath, Swaine & Moore, LLP*, Case No. 16-cv-7992 (S.D.N.Y. Feb. 14, 2017), ECF No. 26.

Although the R&R and Order narrowed the scope of discovery in certain respects, those restrictions will not safeguard against the irreparable harm that animates *Kiobel*'s concern. As explained above, the categories of materials encompassed within the modified Subpoena requests cover extensive legal work Akin's foreign attorneys performed concerning their foreign client's sensitive and confidential corporate structure, governance, and dealings. The R&R and Order do not provide any limitations on SBK's use of that sensitive information once it is produced. On the contrary, the R&R recognized that SBK seeks to use the discovery in various foreign proceedings that do not meet the statutory factors of Section 1782, *see* R&R at 41-42, including an extremely speculative and open-ended proceeding that SBK "intends to file in the Netherlands or another foreign court outside the United States," SBK Brief, ECF No. 6 at 3.

Critically, the Court would also lack power to enforce any remedy should Akin prevail. Ordinarily, in domestic litigation where issues regarding privilege are raised on appeal, courts have the power to block the use of any documents that were produced in the lower court proceeding but later found to be privileged on appeal. *See, e.g.*, *In re Erie County*, 473 F.3d 413, 417 (2d Cir. 2007) (finding that, even where a motion to stay pending appeal was denied and documents alleged to be privileged were already disclosed to the other party, the dispute was not moot because there was still relief available, such as blocking the privileged material from use at further discovery and at trial). But the same is not true with respect to foreign proceedings. *See, e.g.*, *In re Martinez Sampedro*, 2020 WL 1158701, at *2 (D. Conn. Jan. 16, 2020) (finding likelihood of irreparable harm where the petitioner intended to use discovery with foreign regulatory agency, and a protective order could not limit how foreign regulatory agency used that information). Here, once the materials are used in foreign jurisdictions, this Court will have no power to claw them back or require that they be kept confidential.

18

Nor would this Court have any practical ability to enforce a protective order against SBK, even if the parties could negotiate one. SBK has no presence in the United States and is affiliated with a sanctioned Russian bank. SBK's sole purpose in the United States is to seek discovery from attorneys who performed legal work for Fortenova, and from other professionals retained by Fortenova. SBK has not been required to post any bond or pay for any costs of discovery, and is represented by US counsel that will have no practical ability to oversee SBK's use of documents once they are sent abroad. Simply put, once SBK obtains documents, it would have no reason to maintain any connection with the United States, and if it decided to use documents overseas in a way that is not permitted by a protective order, it could do so with impunity.

## III.    A STAY WILL NOT SUBSTANTIALLY INJURE PETITIONER

SBK, on the other hand, will suffer no irreparable injury by waiting until after resolution of the appeal to receive discovery from Akin.

SBK cannot point to any reason to rush discovery here before the Second Circuit has an opportunity to resolve the appeal. The R&R found that there are two foreign proceedings in which the documents sought by SBK may be used: the EU Action and the Malta Action. R&R at 43. But SBK does not have a pressing need for discovery in either of those proceedings, and it will not be harmed by the time-limited stay Akin seeks. *See In re Martinez Sampedro*, 2020 WL 1158701, at *3 (ordering stay, and finding that petitioner would not be substantially injured by stay given his "failure to articulate any particular urgency or time sensitivity to his desire to disclose" the documents at issue); *see also Mohammed*, 309 F.3d at 100 n.6 (distinguishing time period for "stay pending appeal," which "might last for a very brief interval," from a typical preliminary injunction).

In the EU Action, the EU General Court rejected SBK's delisting application on April 30, 2025, after the magistrate judge issued the R&R and just before the Court issued the Order

adopting it. *See* Declaration of Jasper Helder at ¶ 8, Ex. B. While SBK may seek an appeal of the EU General Court's decision, it may do so on points of law only, and an appeal of this nature will typically take between one and two years to resolve. *See id.* at ¶¶ 13-15, 17. Additionally, while the EU General Court noted that the EU Council's document file regarding SBK contained "a memorandum from a law firm dated 14 December 2022 addressed to the Fortenova Group," it stated that both the EU General Court and the EU Council found that the memorandum was of "little evidential value." *See id.* at ¶ 12, Ex. B.

In light of that decision, it is hard to see how SBK may use documents obtained from Akin in that foreign proceeding, let alone how it faces a pressing deadline for doing so. SBK purportedly needs discovery from Akin to "test its theory that the Akin Opinion was not well-founded." R&R at 20. But even if SBK hypothetically stood to gain a treasure trove of information showing that the Akin Opinion was not well-founded, the EU General Court has now made clear that the EU Council did not rely on the Akin Opinion. That decision forecloses any attempt to use the materials SBK seeks to show that the EU Council's decision "derived, in part, from improper pressure exerted by Akin." Order at 12-13.

SBK does not have a pressing need for discovery in the Malta Action, either. As set forth in Akin's initial opposition to the Petition, that case is still in the preliminary pleas phase. Preliminary pleas are affirmative defenses, which are heard and adjudicated before reaching the merits because, if accepted, they would quash the case before the merits are even heard. *See* Declaration of Daniel Buttigieg at ¶ 5. Any information or documentation which Akin has been subpoenaed to produce may only become relevant should the preliminary pleas be rejected. *Id.* at ¶ 6. SBK made its final submission on the preliminary pleas phase on June 16, 2025 and has no further opportunity to submit evidence before the hearing on the preliminary pleas on July 14,

2025. *Id.* at ¶ 8. After the hearing, a decision is not expected for at least fifteen months, after which point SBK will have the remainder of the case to use and submit discovery. *See id.* at ¶¶ 9-10. Discovery in such cases typically spans three years. *Id.* at ¶ 10.

Moreover, there is no risk that the requested documents will be lost or destroyed pending appeal. Akin has retained and will continue to retain the documents sought by SBK pursuant to its normal document-retention practices. And as communicated to SBK's counsel, Akin is committed to taking good-faith steps, short of actually producing documents, to be in a position to comply with the Subpoena in the event that Akin does not prevail on the merits of the appeal. That process would take considerable time in any event, such that a stay pending appeal will not inordinately extend the discovery process if the Second Circuit ultimately rules against Akin.

Overall, a stay will simply "maintain the status quo" pending resolution of the appeal, which will not generate any appreciable harm to SBK. *See Citigroup Glob. Mkts.*, 673 F.3d at 168.

## IV.    THE PUBLIC INTEREST FAVORS A STAY PENDING APPEAL

Finally, a stay would serve the public interest by allowing the Second Circuit to resolve Akin's appeal before Akin is forced to start producing documents. As discussed above, this case implicates significant issues regarding the ability of US law firms to represent their foreign clients. Resolution of questions about the scope and applicability of the *Kiobel* protection will have far-reaching impacts on future Section 1782 cases and on the industry's day-to-day practices. Akin—like many other large law firms—has offices in the United States and in other countries around the world. It is undisputed that Akin provided legal services to its foreign client in this case (even if SBK alleges, and the Order accepts, that Akin also performed "non-legal" services). The industry will benefit from allowing the Second Circuit to clarify its protection of these "attorney-client communications and relations" before they are irreparably "disturbed." *Kiobel* 895 F.3d at 248.

21

In particular, a stay would provide international law firms with US offices critical guidance on the risks of maintaining shared information management systems.   Here, the Subpoena exclusively seeks information obtained or generated by Akin's foreign offices in the course of their representation of a foreign client.   The only reason that this information is accessible from the United States is because the firm's information storage systems allow access here to files from Akin's foreign offices.

Where a US law firm office has access to documents for work done in its foreign offices only by way of shared servers, permitting discovery of those documents would be no less harmful to the interests addressed in *Kiobel* than permitting discovery of documents deliberately sent to the United States for litigation (the circumstance addressed in *Kiobel*).   Both situations would threaten the ability of US law firms to represent foreign clients by creating discovery exposure that foreign clients would not face otherwise.   The Second Circuit has already recognized that "a court may properly, and in fact should, consider the location of documents and other evidence when deciding whether to exercise its discretion to authorize such discovery."   *In re del Valle Ruiz*, 939 F.3d 520, 533 (2d Cir. 2019).   This case demonstrates why:   Because all the relevant documents sought here were created or obtained by Akin's offices outside of the United States in connection with work performed by foreign attorneys for a foreign client concerning foreign dealings, the only domestic implications of allowing discovery for use in the foreign proceedings are the serious harms US law firms would suffer.

On the other side, nothing in the public interest favors requiring Akin to produce documents to SBK before Akin's rights can be adjudicated on appeal.   As set forth above, SBK is a foreign entity whose longtime owner, Sberbank, has been sanctioned as a Russian state-owned entity in the US, UK, and EU.   SBK attempted to avoid sanctions by conducting a sham transaction that

ultimately failed to convince any independent authority that it was no longer controlled by Sberbank. Paralyzed by the existence of a sanctioned shareholder in its capital structure, Fortenova sought legal counsel and pursued legitimate transactions that allowed the company to continue operating as a going concern. Instead of taking earnest actions to change its ownership structure to resolve its sanctions issues, SBK launched a slew of proceedings across Europe against Fortenova and other parties that are generally premised on the claim that it was wrongfully sanctioned. Tellingly, however, in the one foreign proceeding where SBK has attempted to overturn the sanctions decision—the EU Action—SBK's theory has been decisively rejected at every single phase of the proceeding. Rushing discovery in aid of SBK's fruitless pursuit overseas does not serve the public interest.

Nor would forcing discovery before appeal serve "the 'twin aims' of Section 1782." *See Kiobel*, 895 F.3d at 244 (internal citation omitted). Given *Kiobel*'s condition that the materials at issue would not be discoverable in the relevant foreign jurisdictions, and given US courts' legitimate concerns about protecting the attorney-client relationship in this unique context, a stay would hardly implicate Congress's generalized interest in ensuring "similar means of assistance" across borders. *Id.* On the contrary, without a stay, "foreign entities may simply be less willing to engage with U.S. law firms." *Id.* at 248. And because, as discussed above, a stay would not extend inordinately the timeline for any production even if SBK were ultimately to prevail on appeal (particularly given that this case has already been pending for over fifteen months), it would not interfere with the "efficient means of assistance" Section 1782 generally affords. *Id.* at 244. Instead, allowing for the orderly resolution of Akin's serious concerns before this important appeal is rendered moot would permit the Second Circuit to provide much needed clarity to promote more efficient proceedings in future cases. And it would ensure that this case comports with Congress's

mandate that discovery should not be permitted "in violation of any legally applicable privilege." *Id.* at 242 (quoting 28 U.S.C. § 1782(a)).

## <u>CONCLUSION</u>

For the foregoing reasons, Akin respectfully requests that the Court stay its May 30, 2025 Order granting SBK's Petition pending appeal.

Dated:  July 8, 2025                      Respectfully submitted,

                                            */s/ Anne M. Evans*

                                          Anne M. Evans
                                          Sean M. Nolan
                                          AKIN GUMP STRAUSS HAUER & FELD LLP
                                          One Bryant Park
                                          New York, New York 10036
                                          aevans@akingump.com
                                          snolan@akingump.com
                                          (212) 872-1000
                                          (212) 872-1002 (fax)